IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Lynchburg Division

| | |
|---|---|
| R.M.B., by his next friends and parents, | ) |
| Robert Bruce Bays and Linda Markham Bays, | ) |
| *et al.*, | ) |
|      Plaintiffs | ) |
| | ) |
| v. | ) Case No. 6:15-cv-00004 |
| | ) |
| BEDFORD COUNTY (VIRGINIA) | ) |
| SCHOOL BOARD; *et al.* | ) |
|      Defendants | ) |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

COME NOW Plaintiffs R.M.B., Robert Bays, and Linda Bays, by counsel, and

file this memorandum in opposition to the Defendants' Motion for Summary

Judgment.

**INTRODUCTION**

R.M.B. and his parents, Robert and Linda Bays, filed this action on February 3,

2015, alleging violations of R.M.B's procedural due process rights by Defendants

Wilson and Duis, and malicious prosecution by Defendant Calohan and Wilson.

R.M.B. was suspended from Bedford Middle School for 364 days after Defendant

Wilson searched his cinch sack on a tip from another student and discovered a

single leave alleged to be marijuana, and a lighter. Despite three (3) negative field

tests, Defendant Calohan declared the leaf to be marijuana, based solely on her aural

and visual observations. Confidant of her declaration Calohan criminally charged

R.M.B. with possession of marijuana in the Bedford County Juvenile and Domestic

Relations District Court. When the matter came for adjudication the Court *nolle prosequied* on motion of the Commonwealth.

Defendants have moved for summary judgment asserting:

A.  Plaintiff's state law malicious prosecution claim (Count III) fails as a matter of law because Defendant Calohan had probable cause and did not act maliciously;

B.  Defendants did not violate R.M.B.'s procedural and substantive due process rights (Counts I and VI), and even if they did R.M.B.'s rights were not clearly established and are protected by qualified immunity.

Plaintiffs state law malicious prosecution claim is sufficient as a matter of law, their procedural due process rights were violated, and qualified immunity does not shield the Defendants from the consequences of their actions: consequently, except as to substantive due process Defendants' Motion for Summary Judgment must be denied.

## STATEMENT OF FACTS

1.      Every day R.M.B., a shy eleven 11-year-old-male student, boarded a Bedford County Public Schools bus for "about an hour" ride to BMS. *See* ECF 77-1 at 3.

2.      He did not have very many friends at BMS, and during the ride would only interact with one other student, an older student who will be referred to herein as J.T. *See* ECF 77-1 at 2, 10.

3.      Drugs were a problem on this particular bus. *Id.* at 4.

4.      R.M.B. became aware that other students were using drugs on the bus. *Id.*

5.      On Friday, September 19, 2014, R.M.B. reported this information to his parents. *Id.* at 5; *See also* ECF 77-2 at 2.

6.      That same day Defendant Calohan, a Bedford County Sheriff's Deputy assigned to BMS as the school resource officer, spoke to Christy Martin, a parent of another BMS student, who related a story from her child about R.M.B. talking about baking brownies or cookies with marijuana in them. *See* ECF 77-3 at 10-11; *nd see* ECF 77-4 at 2.

7.      Calohan's office is approximately "a 50-yard walk" to assistant principal Brian Wilson's office. *See* ECF 77-5 at 2.

8.      Wilson remembered having a conversation with Calohan that involved R.M.B.'s alleged drug use and "wheat brownies or some type of baked goods…" but at the time, he did not believe it was "relevant enough … to warrant anything… ." *Id.*

9.      The following Monday, September 22, 2014, as R.M.B. sat down on the bus, he placed his backpack on the floor of the bus under his seat. *See* ECF 77-1 at 10.

10.      When R.M.B. got up to leave, he discovered his book bag had slid back behind his seat. *Id.*

11.      On her way to gum class after homeroom, M.S. went to Calohan's office. *See* ECF 77-6 at 4.

12.     M.S. reported to Calohan that she had seen R.M.B. showing off a leaf and lighter in class, which she said R.M.B. claimed was marijuana. *Id.* at 2.

13.     M.S. did not say anything to Calohan about cookies or brownies with marijuana. *Id.* at 5.

14.     M.S. did not tell Calohan that the leaf and lighter would be found in R.M.B.'s backpack. *Id.* at 6.

15.     Between 8:35 and 10:18 a.m. Calohan told Wilson that, " a couple of students had reported to her" that R.M.B. had "marijuana and [was] showing it to other students." *See* ECF 77-5 at 2.

16.     No one but M.S. reported to Calohan that R.M.B. might have marijuana.

17.     Calohan claimed she could only report this information to the assistant principal: she was not permitted to directly investigate an incident of this nature. *See* ECF 77-3 at 12-13.

18.     However, Mr. Wilson stated at the school hearing that typically if he "was going to do a search for something like drugs or drug paraphernalia I would ask the School Resource Officer to be present when I did that search." *See* ECF 54-4, Hearing Transcript, at 12-13.

19.     Wilson stopped R.M.B. on his way to class and said, "Can you come up with me to the office." *See* ECF 77-1 at 6; *See* ECF 77-5 at 4-5.

20.     On the way to the office, Mr. Wilson asked R.M.B., "if [he] had anything in [your] bookbag that I shouldn't have," to which, R.M.B. replied "no." *See* ECF 77-1 at 7; ECF 77-5 at 5.

21.     Wilson called in the nurse, Jessica Snead, to act as a witness and told R.M.B. to "take everything out of [his] book bag and put it onto [Wilson's] desk." *See* ECF 77-1 at 7; ECF 77-5 at 5.

22.     Wilson directed R.M.B. to open the front pocket of the cinch sack and "make sure nothing was in there." To R.M.B.'s shock, inside the front pocket, was a lighter and leaf. *See* ECF 77-1 at 7-8; *See also* ECF 77-7.

23.     Wilson made a statement to R.M.B. that, "This is marijuana," to which R.M.B. replied, "I don't know how that got in there." *See* ECF 54-4 at 21; *See* ECF 77-1 at 8.

24.     Wilson led R.M.B. into an empty storage room behind his office and told him to sit down. *See* ECF 77-1 at 8-9.

25.     Terrified by what had just occurred, R.M.B. blurted out that, "J.T. put [the leaf and lighter] in there." *Id.* at 9. R.M.B. has stated since that he knew at the time this statement was untrue but believed it would sound more believable to Mr. Wilson to say that J.T. put it in his cinch bag than to have to continually deny that he knew anything about the leaf and lighter, which was the truth. *See* ECF 54-4 at 13.

26.     When Calohan returned to the school she went to Wilson's office and conducted two (2) of the three (3) field tests on the leaf in front of R.M.B. and Mr. Wilson. *See* ECF 77-3 at 14, 16-17.

27.     Calohan used "Duquenois-Levine Reagant test kit[s]" for all three (3) tests. *Id.* at 3.

28.    At the police academy, Calohan was trained to put "the substance …
into the kit in the vials that contain the liquid," "break each vial," and then watch for
"the color" to change as the substance "interact[s] with the chemical." *Id.* at 4.

29.    In this test the three (3) vials are broken, approximately one every
minute: after all vials have been broken a conclusion can be drawn. *Id.* at 6-7.

30.    Prior to the test the initial color of the liquid in the test kit is clear. *Id.*
at 4.

31.    If a field test yields a positive result, the colors change to a "deep …
purple" due to "the chemical reaction with THC … in the substance." *Id.* at 5-6.

32.    In Wilson's office Calohan visually and aurally observed the leaf, and
from those observations concluded it was marijuana. Then she "stated that [she]
would obtain the field test kit, [and] test the plant leaf material." *Id.* at 15.

33.    The first field test, "became murky, but … it did not change to purple,"
thereby yielding a negative result. *Id.* at 15-16.

34.    Believing maybe the test was defective, Calohan conducted a second
test. *Id.* at 16.

35.    The second field test produced the "same thing:" "the chemical did not
turn purple." *Id.* at 17.

36.    When R.M.B.'s parents arrived, Calohan explained to them "that it was
their right to send the leaf off to [the] state lab for testing on their own … if they
chose to do so." *Id.* at 20.

37.    Approximately ½ hour after R.M.B. and his parents had left the school
Calohan conducted a third field test on the leaf. *Id.* at 17.

38.     That third test also yielded a "[n]egative" result. *Id.* at 17-18.

39.     After the first two tests, Calohan informed Wilson that they had "yielded negative results to THC" and later that day also informed him of the third negative field result. *Id.* at 22-23.

40.     Calohan sought advice regarding "the results of the test kits" from a fellow school resource officer, Chris Cook, who had "previous vice experience," but he was unable to provide "any helpful advice." *Id.* at 28.

41.     After that, Calohan placed a call seeking advice to the Bedford County Juvenile and Domestic Relations District Court Intake and spoke with intake officer, Gary Harper, about whether to obtain a petition accusing R.M.B. of possession of marijuana. *Id.* at 19-20.

42.     After telling Harper "everything, [including] how I identified it visually and by odor, but yet we had field tests that were yielding negative results, … [I asked him for] further guidance … regarding what to do in terms of seeking a petition:" Mr. Harper told her to "[c]ome on over and we'll look over it when you get here." *Id.* at 24-25.

43.     Upon Calohan's sworn statement, Harper issued a Petition, formally charging R.M.B. with possession of marijuana. *Id.* at 25; *See* ECF 77-8.

44.     In accordance with BMS policy, Wilson automatically suspended R.M.B. from school for 10 days and recommended his expulsion from BMS. *See* ECF 77-5 at 6.

45.     R.M.B.'s mother, Linda Bays, requested a hearing regarding whether to expel R.M.B. from school. *See* ECF 77-9 at 6.

46.     Prior to R.M.B.'s hearing, Duis had presided over approximately 25 disciplinary hearings during the summer of 2014. *Id.* at 2.

47.     Duis is not aware of any policy in place that allows parents to request a certain witness be present at the disciplinary hearing. *Id.* at 5.

48.     Duis stated in his deposition that he has never had a teacher attend a disciplinary hearing as a witness, nor had a parent requested that a teacher attend as a witness. *Id.* at 4-5.

49.     Duis presided over the disciplinary hearing, held on September 29, 2014. *See* ECF 54-4, at 2-3.

50.     Wilson never mentioned the three negative tests during the hearing: instead, he stated that "[t]he field test came back, it didn't show a reaction so whatever that means ... I didn't see anything change, but she told me it was marijuana." *See,* ECF 54-4 at 7, *also see* at 13.

51.     Wilson did not answer, in response to Ms. Sitzler, R.M.B.'s attorney at the time, question whether "the leaf [had] been submitted to a lab for a certificate of analysis?" *See* ECF 54-4 at 12.

52.     Duis suspended R.M.B. for 364 days due to his having "possessed marijuana and a lighter at school." *See* ECF 54-4 at 26.

53.     Wilson was the only witness on behalf of the school board who appeared at the school hearing. *See* ECF 54-4 at 3.

54.     Shortly after the hearing, Duis sent a letter to the R.M.B.'s 's parents confirming the 364-day suspension, and stating that "[t]he reason for the long-term suspension is because [R.M.B.] possessed marijuana ... at school." *See* ECF 77-10.

55. On November 24, 2014, upon motion of the Commonwealth, the Bedford County Juvenile and Domestic Relations District Court *nolle prosequied* the Petition accusing R.M.B. of possessing marijuana. *See* ECF 77-11.

56. R.M.B.'s parents learned for the first time at the juvenile court hearing that Calohan had conducted three (3) tests, which all yielded negative tests, and in response Linda Bays sent Duis a request for a new hearing due to this evidence not being presented at the disciplinary hearing. *See* ECF 77-12 at 1.

57. Duis denied the request stating that "there is no basis for rehearing the case" because "[t]he judicial system and the school process involve separate processes" and time for the appeal process for the school board had passed. *See* ECF 77-13.

58. Previously, R.M.B.'s attorney had noted an appeal, but the Bays ultimately withdrew the appeal before the criminal hearing. *Id.*

59. R.M.B., as a person of school age, who resides within the Bedford school division is entitled to a free public education. *See* Va. Code §22.1-3 (Persons to whom public schools shall be free).

60. R.M.B. never admitted to knowing that the leaf found in his cinch sack was marijuana. *See ECF 54-4,* Transcript of Disciplinary Hearing, at 4-5.

## STANDARD OF REVIEW

In assessing a motion for summary judgment, "all justifiable inferences" must be drawn in favor of the "nonmovant" as "credibility determinations, weighing of evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Under Rule 56(c), a moving party is entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Federal Rules of Civil Procedure (FRCP) 56(c). The party moving for summary judgment is initially responsible for identifying those portions of the factual record that it believes establish that there are no genuine issues of material fact and once the moving party has made this showing, the opposing party must demonstrate, by reference to affidavits, depositions, answers to interrogatories, or admissions, that a triable issue of fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court must determine whether the movant has demonstrated "'that there is an absence of evidence to support [claimant's] case.'" *EEOC v. Clay Printing Co.*, 955 F.2d 936, 940 (4th Cir. 1992) (*citing Celotex*, 477 at 325).

## ARGUMENT AND AUTHORITIES

## I.   PLAINTIFFS' MALICIOUS PROSECUTION CLAIM IS SUFFICIENT TO PREVAIL AS A MATTER OF LAW (COUNT III)

Virginia law on malicious prosecution actions requires the plaintiff to prove by "a preponderance of evidence that the prosecution was (1) malicious; (2) instituted by, or with the cooperation of, the defendant; (3) without probable cause; and (4) terminated in a manner not unfavorable to the plaintiff ... ." *Andrews v. Ring*, 266 Va. 311, 322, 585 S.E.2d 780, 786 (2003), *citing Stanley v. Webber*, 260 Va. 90, 95-96, 531 S.E.2d 311, 314-15 (2000)(*internal citations omitted*). Defendants in their Memorandum for Summary Judgment, identify elements one and three as deficient, *i.e.,* a lack of malice and the presence of probable cause.

### a. Lack of probable cause and Calohan's actions prove malice.

Malice does not require that Calohan displayed towards R.M.B. any "actual spite, hatred, ill will, or grudge against or desire to injure the person charged with the crime." *Freezer v. Miller*, 163 Va. 180, 207, 176 S.E. 159, 169 (1934). The lack of probably cause itself can be sufficient to warrant "an inference of legal malice." *Giant of Virginia, Inc. v. Pigg*, 207 Va. 679,152 S.E.2d 271, 276 (Va. 1967); *see also Bennett v. R&L Carriers Shared Servs., LLC*, 492 F.App'x 315, 329-30 (4th Cir. 2012); *Oxenham v. Johnson*, 241 Va. 281, 402 S.E.2d 1, 2, (Va. 1991).

In this context "malice is defined as any *controlling* motive other than a good faith desire to further the ends of justice, enforce obedience to the criminal laws, suppress crime, or see that the guilty are punished. *Hudson v. Lanier*, 255 Va. 330, 333, 497 S.E.2d 471, 473 (1998)(*citing Freezer*, 163 Va. at 206, 176 S.E. at 169)(*emphasis in original*). An "improper motive" or lack of a "proper motive inferable from a wrongful act based upon *no* reasonable ground constitutes of itself all the malice deemed essential in law to the maintenance of the action." *Id.*

After Calohan had field tested the alleged marijuana leaf three (3) times and obtained a negative result each time, she sought advice from her supervisor and deputy Cook, a fellow school resource officer with vice experience. *See* ECF 77-3 at 27-28. Neither was able to offer any helpful advice. *Id.* Calohan next presented the matter to a juvenile intake officer, Gary Harper. *Id.* at 18-19.

Calohan informed Harper that she "needed further guidance ... regarding what to do in terms of seeking a petition" given that she had "identified ... [the leaf]

visually and by odor, but yet we had field tests that were yielding negative results … ." *Id.* at 24. Harper told her to seek a petition. *Id.* at 28-29.

No basis existed to rely on the advice of a juvenile intake officer (who is not a lawyer and acts akin to a magistrate in the juvenile petition process): despite three (3) negative field tests and no helpful advice from her supervisor or another SRO with vice experience, Calohan went to a juvenile intake searching for someone to give her the answer she wanted. She never consulted with the Bedford Commonwealth's Attorney, and when the petition came on for hearing in District Court the Commonwealth Attorney requested that it be *nolle prosequied*. Calohan's reliance on the advice of Juvenile Intake Officer is no reliance sufficient to save here from this action: only a prosecutor can give legal advice, not courtroom staff, paralegals, or intake officers. Calohan, a new Bedford County Sheriffs Deputy, and newly assigned school resource officer, anted a bust; to be responsible for riding the middle school of marijuana.

> Any *controlling* motive other than a *bona fide* desire to suppress crime and bring the guilty to punishment is such a wrongful motive for the institution of a criminal prosecution that it is malicious within the meaning of the term as here used; and a criminal prosecution instituted upon no or such slight grounds of suspicion as to indicate a general disregard of the rights of others directed by chance against the individual is malicious.

*Freezer*, 176 S.E. at 169-70 (italics in original).

The decision whether to institute criminal proceedings rested with Calohan alone: the intake officer merely "process[es] [the] petition to initiate the case." Virginia Code § 16.1-260. Calohan knew she had problems with pursuing a prosecution of R.M.B.: the evidence known to her was in conflict, whether the leaf

was marijuana or not – this is the essence of probable cause, *i.e.,* whether it is more probable than not that the substance is marijuana. At best Calohan had evidence in equipoise. Despite no probable cause, she sought and obtained a petition charging R.M.B. with possession of marijuana.

No evidence exists that Calohan was motivated by any sense of justice. Rather, she kept asking until she found someone to agree with her and issue the petition.

**b. No probably cause existed for Officer Calohan to charge R.M.B. with possession of marijuana.**

In the context of a malicious prosecution action, probable cause is defined as knowledge of such facts and circumstances to raise the belief in a reasonable mind, acting on those facts and circumstances, that the plaintiff is guilty of the crime of which he is suspected. The determination whether a defendant had probable cause to believe that a crime was committed is judged with reference to the time the defendant took the action initiating the criminal charges. When the facts relating to the question of probable cause are in dispute, the issue is one of fact to be resolved by the trier of fact.

*Andrews v. Ring*, 266 Va. 311, 322, 585 S.E.2d 780, 786 (2003), *citing Stanley v. Webber*, 260 Va. 90, 95-96, 531 S.E.2d 311, 314-15 (2000)(*internal citations omitted*).

Calohan relies heavily on the fact that she asked Gary Harper, the juvenile intake officer, "whether that information [contained in her report] was sufficient to charge R.M.B. with possession of marijuana" and Harper's subsequent issuance of the petition. *See* ECF 54-1 at 1. A juvenile intake officer, however, is not the prosecutor or even an attorney. Harper's advice is of no consequence; if Calohan wanted true guidance she should have sought out the Commonwealth's Attorney.

The test for probable cause in Virginia is "'whether the facts and

circumstances known, or made known, to the [complainant] are sufficient to justify a prudent and reasonable man in the belief that an accused is guilty of the crime charged.'" *Hampton v. Mathis*, Nos. 87-2653, 87-2654, 1988 U.S. App. LEXIS 20542, at *7 (4th Cir. Sep. 1, 1988), *quoting Giant of Va., Inc. v. Pigg*, 207 Va. 679, 684, 152 S.E.2d 271, 276 (1967). Calohan's reliance on *Evans v. Chalmers*[1] is misplaced because that case dealt with a § 1983 malicious prosecution claim. A juvenile intake officer is not an "independent decision-maker[ ]" of the sort relied upon in *Chamber, i.e.,* "prosecutors, grand juries, and judges," who merely "process[es] petitions to initiate a case." Virginia Code 16.1-260.

Calohan was on sufficient notice that the facts and circumstances did not reach the level of probable cause that R.M.B. had committed a crime. She ignored the scientific evidence acquired from three negative field tests. She did not attempt to send the leaf to more reliable entity for a chemical analysis. In short, no probable cause existed that R.M.B. possessed marijuana.

Her contention that a picture on R.M.B.'s cell phone of a leaf that appears to be marijuana along with the words "f**k you" supports probable cause is nonsense. Vulgar language is not evidence of any illegal act. Calohan would have no more basis to search for marijuana someone wearing a t-shirt bearing the same image and words than she did to charge R.M.B., especially in light of three (3) negative field tests.

---

[1] 703 F.3d 636, 647 (4th. Cir. 2012).

## II.    R.M.B. DID NOT RECEIVE THE PROCEDURAL DUE PROCESS REQUIRED BY LAW.

### a.    Defendants Duis and Wilson violated R.M.B.'s procedural due process rights through their failure to disclose exculpatory evidence.

"The fundamental requisite of due process of law is the opportunity to be heard," which provides little value if a student is not informed of the pending matter and has the choice of contesting the matter. *Goss v. Lopez*, 419 U.S. 565, 579 (1975), *quoting* Grannis v. Ordean, 234 U.S. 385, 394 (1914); *see Mullan v. Central Hanover Trust Co.*, 339 U.S. 306, 314 (1950); *see also Armstrong v. Manzo*, 380 U.S. 545, 550 (1965); and *Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 168-169 (1951) (Frankfurter, J., concurring). "At the very minimum, therefore, students facing suspension and the consequent interference with a protected property interest must be given *some* kind of notice and afforded *some* kind of hearing." *Id.*[2]

A procedural due process violation requires R.M.B. to demonstrate: "(1) a cognizable 'liberty' or 'property' interest; (2) the deprivation of that interest by 'some form of state action'; and (3) that the procedures employed were constitutionally inadequate." *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 146 (4th Cir. 2009), *quoting Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988). Defendants' arguments do not contest the first and second elements, but contest the third element, *i.e.,* the purported adequacy of the proceedings.

R.M.B. does not contest that the rudimentary elements of procedural due

---

[2] In *dicta* the Court noted that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *See Goss*, 419 U.S. at 584.

process were present in the initial hearing conducted by Defendants Wilson and Duis. Rather, the law must require more than only the rudimentary elements of due process when the extremely punitive discipline of expulsion and/or a 364-day suspension is at issue.[3] *See DeFabio v. E. Hampton Union Free Sch. Dist.*, 658 F. Supp. 2d 461, 489 (E.D. N.Y. 2009)(greater due process may be required for a longer suspension).

The Fifth Circuit, in a case prior to *Goss*, noted that:

> the "rudimentary elements of fair play," a school must meet four requirements before expelling a student: (1) the student must receive notice of the charges against him; (2) there must be a hearing, at which the student may present a defense and testimony or statements of witnesses on his behalf; (3) the student should be given the names of witnesses against him and a summary of the testimony each is expected to give; [and] (4) if the hearing is not before the body that will make the ultimate disciplinary decision, then the hearing body should file a written report of its findings and make the report available to the student.

*J.S. v. Isle of Wight Cty. Sch. Bd.*, 362 F. Supp. 2d 675, 682 (E.D. Va. 2005), *quoting Dixon v. Alabama Bd. Of Educ.*, 294 F.2d 150, 158-59 (5th Cir. 1961); *see also Sohmer v. Kinnard*, 535 F. Supp. 50, 53 (D. Md. 1982).

In this case, the Defendants have violated even the rudimentary elements of fair play by not providing a procedural mechanism by which R.M.B. could call witnesses in his defense nor was a summary of the evidence given to him either before the hearing or during the hearing. Wilson did not explain or provide any information before or during the hearing about the three negative field tests, explaining only:

---

[3] Mr. Wilson's original recommendation was expulsion; Mr. Duis modified this to being suspended from school for 364 days. *See* Def.'s Ex. 4 (Hearing Transcript)(hereinafter "Hearing Tr.") at 24.

[t]he field test came back, it didn't show a reaction so whatever that means. That's not my field of expertise. I'd have to let her speak to what the field test indicated. She told me it was marijuana. She's a professional in that field. I went on her statement [and]

...

if there is a question for identifying substances then I defer to her professional training as to what that substance is or what it may or may not be.

*See* ECF 54-4 at 7,13.

Calohan was not present at the disciplinary hearing to provide her professional opinion and/or explanation of the evidence to the Plaintiffs. Moreover, no procedural mechanism existed to compel Calohan's attendance and testimony, nor were R.M.B. or his parents advised that they could obtain or present witnesses at the hearing.

As a result of this lack of procedure Plaintiffs were unaware of the three negative field tests until the criminal charge of possession of marijuana was *nolle prosequied. See* ECF 77-12. If Duis and Wilson had provided a hearing with more formal process that should be afforded a student faced with such severe discipline, then R.M.B. would have been in a position to adequately defend himself by being provided with exculpatory evidence (which Wilson avoided testifying to even at the hearing), being able to procure and present evidence and witnesses, such as Calohan. Then, after the exculpatory evidence is brought to Duis' attention, he refused to grant a new hearing for R.M.B. *See* ECF 77-13. If the process is so informal why is Duis able to hide behind the formality of deadlines: the school should not be able to pick and choose which aspects of due process to enforce strictly or informally.

Duis and Wilson denied R.M.B. due process: Wilson withheld exculpatory evidence – he knew the negative field tests meant the test failed yield a result that the leaf was marijuana; and Duis afforded R.M.B. no process to compel witnesses, to advise R.M.B. of exculpatory evidence, or to obtain a reconsideration of the outcome of the proceeding once the exculpatory evidence came to light. The process afforded R.M.B. is the essence of a kangaroo court: the school holds all the information, the school decides the punishment, and the school has no obligation to do anything more than the bare minimum, *i.e.,* advise the student the offense alleged and give him the opportunity to be heard, albeit at an informational disadvantage.[4]

### III. QUALIFIED IMMUNITY DOES SHIELD THE DEFENDANTS FROM LIABILITY.

Qualified immunity "shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Covey v. Assessor of Ohio Cty.*, 777 F.3d 186, 195-96 (4th Cir. 2015), *quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2080 (2011) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982)). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would have understood that what he is doing violates that right.'" *Id., quoting Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (*quoting al-Kidd*, 131 S. Ct. at 2078 (brackets and internal quotation marks omitted)).

Officials are not liable for bad guesses in gray areas; they are liable for

---

[4] But for the criminal proceeding R.M.B. and his parents to this day might not know that the Defendants never proved that the substance was marijuana.

transgressing bright lines. *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992), *citing Anderson v. Creighton,* 483 U.S. 635, 639-40 (1987); *Gooden v. Howard County,* 954 F.2d 960, 968 (4th Cir. 1992) (en banc). "[T]he concept of due process is premised upon fairness and reasonableness in light of the totality of circumstances." *Hillman v. Elliott*, 436 F. Supp. 812, 816 (W.D. Va. 1977) citing *Ingraham v. Wright*, 525 F.2d 909, 917 (5th Cir. 1976). "The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense." *Meyers v. Baltimore Cty., Md.*, 713 F.3d 723, 731 (4th Cir. 2013)

Applying the "totality of the circumstances" test to these facts, sufficient process was not provided to R.M.B. that could be said to afford him a fair hearing. Wilson omitted and misled Duis about the negative field tests through his failure to inform Duis, R.M.B. and R.M.B.'s counsel that three field tests had produced negative results for marijuana. Calohan was not present and her presence could not be secured by R.M.B. or his attorney under the procedures established by the school board. Then, when R.M.B., through his mother, brings the exculpatory evidence to Duis' attention, Duis refused to reconsider his decision under the guise of formality of procedure.

In the criminal justice system, "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice … [and] [t]he same result [occurs] when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Fitzgerald v. Bass*, 6 Va. App. 38, 45, 366 S.E.2d 615, 619 (1988) (*internal citations omitted*). Although a school disciplinary hearing is different from a criminal proceeding, the principles apply, especially when the punishment is expulsion or a long-term (*i.e.,* 364-day) suspension. The school's interests never justify hiding exculpatory evidence, and preventing a student from presenting a defense. Unfortunately, this is exactly what the Defendants did to R.M.B and his attorney.

## CONCLUSION

Defendant Calohan has not shown that she lacked malice or probably cause in her institution of criminal charges against R.M.B. Wilson and Duis denied R.M.B. procedural due process through their failure inform him of the evidence that existed against him, by denying him the ability to call witnesses to his defense, and by refusing to reconsider the punishment exacted once the exculpatory evidence came to light.

Qualified immunity does not save the Defendants from the responsibility of their actions as the constitutional right to a fair hearing for students has been clearly established by law for over fifty years and has always included the ability to call witnesses and the right of the accused to examine all of the evidence.

For the foregoing reasons, Plaintiffs respectfully request that this Court deny

the Defendants' motion for summary judgment, and instead granting their motion

for summary judgment.

RESPECTFULLY SUBMITTED,
R.M.B., by his next friend and parents,
Robert Bruce Bays and Linda Markham
Bays, ROBERT BRUCE BAYS, AND LINDA
MARKHAM BAYS

 s/ Melvin E. Williams
 Of counsel

Melvin E. Williams (VSB No. 43305)
MEL WILLIAMS PLC
1320 Third Street, SW
Roanoke, Virginia 24016
540-266-7800
540-206-3857 *facsimile*
*mel@melwilliamslaw.com*
        Counsel for Plaintiffs

CERTIFICATE OF SERVICE

On February 17, 2016, the foregoing pleading was filed using the Court's

CM/ECF system, which will send electronic notification to counsel of record.

s/ Melvin E. Williams
Of counsel
