# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

R.M.B., *ET AL.*,
          *Plaintiffs,*

v.

BEDFORD COUNTY (VIRGINIA) SCHOOL BOARD, *ET AL.*,
          *Defendants.*

CASE NO. 6:15–cv–00004

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

This matter is before the Court upon Defendants' motion for summary judgment (docket no. 53) and Plaintiffs' cross-motion for summary judgment (docket no. 76).

Plaintiffs in this suit are R.M.B., an 11-year-old boy who was enrolled as a student at Bedford Middle School ("BMS") for the 2014–15 school year; his father, Robert Bays, a retired schoolteacher; and his mother, Linda Bays, a schoolteacher employed by the Bedford County School Board ("BCSB"). Defendants are Brian Wilson, an assistant principal at BMS; Dr. Frederick M. Duis Jr., the Chief Operations Officer for Bedford County Public Schools ("BCPS"); and M. M. Calohan, a law enforcement officer employed as a deputy of the Bedford County Sheriff, and who was assigned to BMS as a school resource officer.

Plaintiffs' suit contains three claims: a Virginia state law claim of malicious prosecution; a claim of deprivation of due process; and a claim of deprivation of substantive due process. For the following reasons, I will grant Defendants' motion for summary judgment, and deny Plaintiffs' motion for summary judgment.

## I. STANDARD OF REVIEW

Summary judgment is warranted if the Court concludes that no genuine issue of material fact exists for trial and that the moving party is entitled to judgment as a matter of law, based on the totality of the evidence, including pleadings, depositions, answers to interrogatories, and affidavits. *Whiteman v. Chesapeake Appalachia, L.L.C.*, 729 F.3d 381, 385 (4th Cir. 2013) (citing Fed. R. Civ. P. 56). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To demonstrate that a genuine issue of material fact exists, a party may not rest upon his own mere allegations or denials. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Rather, the party must "proffer[] sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993). To this end, a district court has an "affirmative obligation . . . to prevent 'factually unsupported claims [or] defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323–24).

## II. UNDISPUTED FACTS

### A. INITIAL REPORTS TO CALOHAN

Calohan received a report on September 19, 2014, from Christy Martin, a parent of a student at BMS. Martin reported that R.M.B. "was telling people at school he was selling brownies and cookies with marijuana [baked inside]." Docket No. 54, Ex. 1, at 6 (hereinafter "Calohan Dec."); *see also* Docket No. 77, Ex. 4, at 2:10–15 ("[M]y daughter had heard . . . about a child bringing marijuana cookies in and offering it to students.") (hereinafter "Martin Dep.").

Calohan received a similar report the following Monday morning, September 22, 2014. A female sixth grade student, identified as M.S., went to Calohan's school office and told her that

R.M.B. "brought this leaf to school that he said was marijuana." Docket No. 77, Ex. 6, at 20:10–15 (hereinafter "M.S. Dep."). M.S. also reported that R.M.B. had a lighter, rolled cigarette paper into a cigarette and lit the end of it, and that he and a high school student were selling marijuana on his bus. Calohan Dec. 6.

B. WILSON'S INVESTIGATION

Calohan relayed these reports to Wilson later that morning, and he retrieved R.M.B. from class. Docket No. 54, Ex. 2, at 4 (hereinafter "Wilson Dec."); Docket No. 77, Ex. 1, at 9:11–17 (hereinafter "R.M.B. Dep."); Docket No. 77, Ex. 5, at 4:22–5:1 (hereinafter "Wilson Dep."). While walking to his office, Wilson asked R.M.B. if he had anything in his cinch sack that he should not have, to which R.M.B. responded "No." R.M.B. Dep. 10:5–6; Wilson Dep. 5:2–6.

Once in his office, Wilson decided to search R.M.B.'s cinch sack. Officer Calohan was responding to a call at the elementary school at the time, and so Wilson called the school nurse into his office to witness the search. Wilson Dec. 4; Wilson Dep. 5:1–2. Wilson and R.M.B. emptied R.M.B.'s cinch sack, and Wilson discovered in the front pocket of the sack what appeared to be a crumpled marijuana leaf and a lighter. R.M.B. Dep. 10:22–11:4; Wilson Dep. 5:6–10; *see also* Docket No. 54, Ex. 3, at 2–4 (hereinafter "Photo Ex.").

Wilson asked R.M.B. how he came to possess the items, and R.M.B. told him that a high school student, identified as J.T., gave him the leaf and the lighter. R.M.B. Dep. 12:3–4; Wilson Dec. 4. R.M.B. stated that he did not purchase the leaf from J.T., but instead that it was given to him to keep. Wilson Dec. 4.

C. CALOHAN'S INVESTIGATION AND R.M.B.'S CRIMINAL CHARGE

Wilson called Calohan into his office when she returned to school, and she examined some of R.M.B.'s possessions. She observed that R.M.B. had a picture of a cannabis plant on the

welcome screen of his phone, which was overlaid with the text "F*** YOU." Calohan Dec. 7; Photo Ex. 4.

She also inspected the leaf. She "observed [the leaf] visually, noticed that it was five leaves coming off an individual stem, each leaf being serrated on the edge which was consistent with that of marijuana." Calohan Dep. 15:11–14. She also "observed the odor of the leaf, which [she] knew through [her] training to be the odor of marijuana, consistent with that of marijuana." *Id.* at 15:14–16. Based on her training and experience, she knew based on the size, shape, color, and smell of the leaf that it was consistent with marijuana. Calohan Dec. 6.

Calohan placed a portion of the leaf in a Duquenois-Levine Reagent field test kit (hereinafter "field test"). Calohan Dep. 3:21. Such field tests are used to detect the presence of marijuana, hashish, THC, and hash oil. Calohan Dec. 6. The field test yielded a negative result, meaning that the leaf did not indicate the presence of any of the above-named substances. Calohan Dep. 15:24–16:1. Calohan conducted a second field test, which also yielded a negative result. *Id.* at 17:8–11. Calohan conducted a third field test thirty minutes later, which also yielded a negative result. *Id.* at 17:17–18:1.

"Concerned with the results of the test kit," Calohan sought guidance from fellow officer Chris Cook, another school resource officer. Cook did not, however, have any helpful advice. Calohan Dep. 28:5–16.

Calohan subsequently contacted Gary Harper, an intake officer at the Juvenile and Domestic Relations District Court. Calohan told Harper "everything," including that she identified the leaf as marijuana both visually and olfactorily, but that the three field tests yielded negative results. *Id.* at 24:17–20. She asked for "further guidance on regarding what to do in terms of seeking a petition." *Id.* at 24:20–22.

Harper requested that Calohan come to his office. When she arrived, Harper looked over all of the evidence that she provided, and he advised Calohan that he believed the information sufficient to issue a petition. *Id.* at 24:24–25:4; Calohan Dec. 2. Harper thereafter issued an intake petition accusing R.M.B. of possessing marijuana. Calohan Dep. 24:24–25:4.

The leaf was not sent to state forensics for further testing, however, and so the petition was *nolle prosequied* on November 24, 2014. Docket No. 77, Ex. 11.

D. R.M.B.'S SUSPENSION AND ADMINISTRATIVE HEARING

Wilson contacted R.M.B.'s parents while Calohan was concluding her investigation. Wilson told them he received reports indicating R.M.B. possessed marijuana, and that he found a lighter and a leaf that appeared to be marijuana in R.M.B.'s cinch sack. Wilson Dec. 4. Wilson suspended R.M.B. for ten days and recommended that he be expelled pursuant to Bedford County's "Zero Tolerance" policy. *Id.* at 4; Wilson Dep. 6:3–10.

Because Wilson recommended expulsion, R.M.B. had the right to participate in an administrative hearing before an administrative hearing officer. Duis, who was appointed as an administrative hearing officer by the superintendent of BCPS, oversaw R.M.B.'s hearing. Docket No. 54, at 1 (hereinafter "Hr'g Tr."). R.M.B. attended the hearing with his attorney, Emily Sitzler, and both of his parents. *Id.* Wilson was also present at the hearing.

Wilson recounted the evidence against R.M.B. at the hearing. R.M.B.'s parents and his attorney were allowed to ask questions of Wilson and to make arguments. For example, they argued the reports indicating R.M.B. had marijuana were not credible and not specific to R.M.B. Hr'g Tr. 14–15.

Moreover, R.M.B. was allowed to present his own narrative of events. R.M.B. claimed that a student sitting next to him on the bus must have placed the lighter and the leaf in his cinch

pack without his knowledge. *Id.* at 11–12. This was contrary to R.M.B.'s original story, and he was allowed to explain this inconsistency, stating that he lied to Wilson because he did not think Wilson would believe the truth. *Id.* at 12–13.

After hearing the evidence and the arguments, Duis found on the record that R.M.B. knowingly possessed either marijuana or a marijuana lookalike. *Id.* at 20. Duis nevertheless reduced R.M.B.'s punishment from expulsion to suspension for 364 days, with the opportunity to attend an alternative school while suspended and to return to BMS at the end of the first semester if R.M.B. maintained good grades, had no disciplinary issues, and completed the County's Drug Intervention Program. *Id.* at 24.

### III. DISCUSSION

#### A. MALICIOUS PROSECUTION

Plaintiffs assert a claim of malicious prosecution against Calohan and Wilson. Because "criminal prosecutions are essential for maintaining an orderly society," "[m]alicious prosecution actions arising from criminal proceedings are not favored in Virginia and the requirements for maintaining such actions are more stringent than those applied to other tort cases." *O'Connor v. Tice*, 704 S.E.2d 572, 575 (Va. 2011).

To prevail on a malicious prosecution action, a plaintiff must prove by a preponderance of the evidence that the prosecution was (1) malicious, (2) instituted by or with the cooperation of the defendant or defendants, (3) without probable cause, and (4) terminated in a manner not unfavorable to the plaintiff. *Lewis v. Kei*, 708 S.E.2d 884, 889 (Va. 2011); *O'Connor*, 704 S.E.2d at 575.

1. Wilson Is Entitled to Summary Judgment

Plaintiffs do not dispute that Wilson is entitled to summary judgment, and for good reason—no reasonable jury could find that R.M.B.'s prosecution was "instituted by or with the cooperation of" Wilson.

Although there exists no one articulated rule defining when a criminal proceeding was instituted by or with the cooperation of a defendant, *see Bennett v. R&L Carriers Shared Servs., LLC*, 744 F. Supp. 2d 494, 510 (E.D. Va. 2010), generally the defendant must have "affirmatively, actively, and voluntarily took steps to instigate or to participate in the arrest of the defendant, [or the] defendant [must have] exercised some level of control over the decision to have the plaintiff arrested." *Id.* at 511–12. Courts consider whether the defendant "ever urged or . . . suggested to [an official] that he prosecute the plaintiff." *See Am. Ry. Express Co. v. Stephens*, 138 S.E. 496, 500–01 (Va. 1927).

There are no facts in the record from which a jury could find that Wilson urged Calohan to seek a criminal intake petition against R.M.B. Likewise, there are no facts from which a jury could find that Wilson "requested the initiation of proceedings, signed a complaint, or swore out an arrest warrant against the plaintiff." *See Brice v. Nkaru*, 220 F.3d 233, 239 (4th Cir. 2000). Wilson merely reported to Calohan that he discovered a lighter and what appeared to be a marijuana leaf in R.M.B.'s cinch sack. "[If a] defendant simply reported the occurrence of events to the police . . . then that individual cannot be held liable for malicious prosecution so long as the information provided was with an honest or good faith belief of the facts reported." *Bennett*, 744 F. Supp. 2d at 512.

Accordingly, I will grant summary judgment in favor of Wilson on this claim.

2. <u>Calohan Is Entitled to Summary Judgment</u>

The parties dispute whether Calohan had probable cause to seek charges against R.M.B. "[I]n the context of a malicious prosecution action, probable cause is defined as knowledge of such facts and circumstances to raise the belief in a reasonable mind, acting on those facts and circumstances, that the plaintiff is guilty of the crime of which he is suspected." *O'Connor*, 704 S.E.2d at 576.

Calohan points to the following facts as establishing probable cause to charge R.M.B. with possession of marijuana:[1] (1) the reports she received from Martin and from M.S., both of which indicated that R.M.B. possessed marijuana; (2) the fact that the leaf was found with a lighter; (3) the fact that the leaf was found in addition to a cell phone which displayed a picture of a marijuana leaf; (4) R.M.B.'s statements to Wilson that he was given the leaf and lighter by a high school student to keep; and (5) her positive identification of the leaf as marijuana based on the visual characteristics and odor of the leaf.

Where, as here, there are no material disputes of fact, "the court determines as a matter of law whether [the facts] amount to probable cause." *Caldwell v. Green*, 451 F. Supp. 2d 811, 818 (W.D. Va. 2006); *see also Clarke v. Montgomery Ward & Co.*, 298 F.2d 346, 348 (4th Cir. 1962) ("[I]t is a settled rule that in a suit for malicious prosecution, what constitutes probable cause is a question of law for the judge to decide."); *Thomas v. Lamanque*, 986 F. Supp. 336, 339 (W.D. Va. 1997) ("Whether probable cause exists is a matter for the courts unless there is a conflict in the evidence, in which situation probable cause becomes a matter for a jury.")

---

[1] Defendants argue that because Calohan disclosed all of the evidence to Harper, a neutral intermediary, she is shielded from that intermediary's incorrect determination that probable cause existed. Defendants rely on *Evans v. Chalmers*, 703 F.3d 636, 647–48 (4th Cir. 2012) and *Chipouras v. AJ&L Corp.*, 290 S.E.2d 859, 861 (Va. 1961), for this proposition. Defendants' reliance on *Evans* and *Chipouras* is, however, misplaced. *Evans* and *Chipouras* held that an officer is shielded when they disclose evidence to *counsel*, who then subsequently makes an incorrect determination that probable cause exists. Here, Calohan disclosed evidence to Harper, a fellow police officer, rather than counsel. Accordingly, Calohan is not shielded from liability on this basis.

Plaintiffs argue that any probable cause Calohan may have had was vitiated when she performed three field tests, all of which yielded negative results. No Court has held that negative field tests vitiate probable cause as a matter of law. *See, e.g.*, *People v. Rayford*, 725 P.2d 1142, 1146–57 (Colo. 1986) (holding that probable cause can exist despite a negative field test if sufficient other factors were present); *cf. Berg v. State*, 384 So. 2d 292, 293–94 (Fla. Dist. Ct. App. 1980) ("[A]ny probable cause which [the officer] might have had [that the substance was illicit] was surely diminished as a result of three or four negative field tests conducted with three different test kits.").

Although the three field tests yielded negative results, "a law enforcement officer does not have to conduct a chemical field test of the contraband or establish proof positive that a leafy green plant substance is in fact marijuana." *Richardson v. State*, 622 S.W.2d 852, 857 (Tex. Crim. App. 1981). Indeed, Reagent field tests can be "unreliable when used on plants that are recently cut or still growing—the test is designed for plants that have been dried or cured over extended periods of time." *Waltman v. Payne*, 535 F.3d 342, 347 (5th Cir. 2008).[2]

There are sufficient other factors present to support probable cause on these facts. A leafy green substance with the size, shape, color, and smell of marijuana was found with a lighter and in the possession of an individual reported to possess marijuana and who admitted to receiving

---

[2] It is worth noting that two independent experts hired by the Defendants and Plaintiffs positively identified with certainty the leaf in question as marijuana. Whether an officer had probable cause turns, of course, upon whether the officer had probable cause based on the facts and circumstances available to him at the time of the determination, *see Beck v. Ohio*, 379 U.S. 89, 91 (1964), and so this after-the-fact determination is not relevant to the probable cause analysis. Nevertheless, it illustrates why Plaintiffs' desired *per se* rule (that negative field tests always vitiate probable cause) is untenable. The rule would authorize malicious prosecution actions in cases, like ours, where the plaintiff actually possessed a controlled substance, but the field test yielded a negative result. The better rule is that while a negative field test is one factor to consider, where sufficient other factors are present, a negative field test does not necessarily vitiate probable cause. *Accord Rayford*, 725 P.2d at 1146. This rule is consistent with the Supreme Court's recent discussion of probable cause in *Florida v. Harris*, 133 S. Ct. 1050 (2013) ("The test for probable cause is not reducible to 'precise definition or quantification,'" *Harris*, 133 S. Ct. at 1055 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003), and instead requires only a "'fair probability' on which 'reasonable and prudent [people], not legal technicians, act.'" *Harris*, 133 S. Ct. at 1055 (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).

the leaf and lighter to keep. These facts are enough to raise the belief in a reasonable mind that the leaf is marijuana, the negative field tests notwithstanding.

Accordingly, I will grant summary judgment in favor of Calohan on this claim.

B. PROCEDURAL DUE PROCESS

Plaintiffs allege that Wilson and Duis violated R.M.B.'s procedural due process rights because, *inter alia*, they failed to disclose "exculpatory evidence"[3] and because they did not provide a procedural mechanism by which R.M.B. could call witnesses at his hearing. R.M.B. was, however, provided with notice of the charges against him and received a robust and full hearing. This was sufficient process.

Students facing suspensions from school that are ten days or less "must be given some kind of notice and afforded some kind of hearing." *Goss v. Lopez*, 419 U.S. 565, 579 (1975). The Supreme Court has not established what process is required for students facing "[l]onger suspensions or expulsions for the remainder of the school term, or permanently," stating in dicta only that such suspensions "may require more formal procedures." *Goss*, 419 U.S. at 584; *see also J.S. ex rel. Duck v. Isle of Wight Cty. Sch. Bd.*, 362 F. Supp. 2d 675, 681 (E.D. Va. 2005)

---

[3] Plaintiffs claim that Calohan's three negative field tests exculpate R.M.B. R.M.B. could, however, have been suspended or expelled under Bedford school policy for possessing marijuana, or a marijuana lookalike. And indeed, whether the substance R.M.B. possessed was actually marijuana was not the dispositive, or even central, issue at his hearing. Moreover, all parties at the hearing acknowledged that R.M.B. could be suspended or expelled for possessing imitation marijuana. *See* Hr'g Tr. 4 ("MR. WILSON: . . . [P]er our county policy, if it was held and it was treated as marijuana, we treat it the same as if it is marijuana. So if he was representing it as marijuana to other people, it's the same per Bedford County policy as if it, you know, either way."); *Id.* at 17–18 ("MS. SITZLER: . . . [I]f he were saying, 'Hey look, I have this leaf,' . . . I recognize that that would be a violation of the code of student conduct . . . ."); *Id.* at 19 ("MRS. BAYS: So again, I don't want anyone to feel that we do not understand that the lighter would get him suspended or that the pretense of marijuana would get him suspended."); *Id.* at 20 ("DR. DUIS: . . . I think it's clear that [R.M.B.] possessed marijuana or a look alike very close to it at school.").

("There is no Supreme Court case dealing with the due process rights of students facing long-term suspensions or expulsion . . . ."). Neither has the Fourth Circuit addressed this issue.[4]

Other circuits have said that students facing long-term suspensions must be given notice and a meaningful opportunity to be heard. *See, e.g.*, *Remer v. Burlington Area Sch. Dist.*, 286 F.3d 1007, 1010–11 (7th Cir. 2002) ("[E]xpulsion procedures must provide the student with a meaningful opportunity to be heard . . . As long as the student is given notice of the charges against him, notice of the time of the hearing and a full opportunity to be heard, the expulsion procedures do not offend due process requirements.") (internal quotation marks and citations omitted). Accordingly, R.M.B. was entitled to notice of the charges against him and a meaningful opportunity to be heard.

Wilson and Duis satisfied this standard.[5] Wilson provided R.M.B. and his parents sufficient notice of the charges against R.M.B. Wilson called R.M.B.'s parents to the school, and when they arrived, he "informed them of what had been discovered [in R.M.B.'s cinch sack] and what [R.M.B.'s] statement was." Wilson Dec. 4. Moreover, Wilson "went over the county police [and] procedure as it applied to consequences for possession of marijuana." *Id.* He further "gave [R.M.B.'s parents] a copy of the ten day suspension letter and reviewed information about the discipline hearing process." *Id.*

---

[4] For this reason alone, Wilson and Duis would be entitled to qualified immunity because the right to exculpatory evidence and the right to call witnesses in an expulsion proceeding was not clearly established. *See Danser v. Stansberry*, 772 F.3d 340, 346 (4th Cir. 2014) (internal citation omitted).

[5] Although Plaintiffs claim that Wilson and Duis violated R.M.B.'s procedural due process rights because they failed to disclose exculpatory evidence (the negative field tests) and because they did not provide a procedural mechanism by which R.M.B. could call witnesses, neither the Supreme Court nor the Fourth Circuit have held that such formal mechanisms are required in an academic, non-criminal context. Indeed, in an unpublished case, the Fourth Circuit, considering counsel's argument "that a trial-like proceeding, with the attendant right to call and cross-examine witnesses, should have been afforded," ultimately "f[oun]d no basis in law . . . for importing such a requirement into the academic context." *Butler v. Rector & Bd. of Visitors of Coll. of William & Mary*, No. 03–2119, 2005 WL 289974, at *4 (4th Cir. Feb. 8, 2005) (unpublished) (student expelled from graduate school was given substantial process where she was "informed . . . of the most serious charges and complaints against her and provided . . . with an opportunity to respond."). At any rate, no such rights were clearly established at the time Wilson and Duis acted, and so they would be entitled to qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

R.M.B. also was provided with a full hearing and a meaningful opportunity to be heard. R.M.B. attended the hearing with his parents and his attorney, Emily Sitzler. *See* Hr'g Tr. 1. At the hearing, Wilson provided the parties with a Discipline Packet, which contained a summary of the incident, R.M.B.'s grades, and a statement of the events that happened on Monday, September 22. *Id.* Wilson also provided an oral summary of the inculpatory evidence and answered questions from R.M.B.'s parents and his attorney throughout the hearing. While Wilson did not disclose with precision that Calohan conducted three field tests that yielded negative results, he did disclose that a field test was conducted but it did not "show a reaction." *Id.*

R.M.B.'s attorney and parents were permitted to question Wilson about the school's inculpatory evidence. For example, Sitzler established through her questioning that Calohan conducted a field test which did not react, and that she was only able to identify the leaf as marijuana visually and by odor.[6] Moreover, both R.M.B.'s attorney and parents were permitted to, and in fact did, make arguments based on the fact that the field test did not react.[7] R.M.B.'s parents and attorney were also able to question Wilson about the witnesses who reported R.M.B.'s conduct, suggesting that they were either not credible or that their reports were not specific to R.M.B.[8]

---

[6] *See* Hr'g Tr. 3 ("MS. SITZLER: So it was just a visual [identification].").

[7] *See, e.g.*, Hr'g Tr. 8–9 ("MR. BAYS: . . . There's not a lot of facts here. The marijuana leaf that was found cannot even be verified as being marijuana technically from what I'm hearing."); *Id.* ("MR. BAYS: He said that there was nothing that showed upon the test. MRS. BAYS: The field test did not react."); *Id.* at 17–18 ("MS. SITZLER: . . . [W]e've got these rumors and suppositions and yes, a leaf was found, but it was a leaf that apparently maybe didn't meet the field test.").

[8] *See, e.g.*, Hr'g Tr. 8 ("MR. BAYS: That's what really concerns me is the rumors and this being based essentially on rumor . . . My concern is that he was set up and they looked at him as somebody they could pass this off on . . . ."); *Id.* at 11 ("MR. BAYS: If you can believe a student that tells that another student has drugs, why can't you just as equally believe a student who says that he didn't know it was in his book bag and someone had put it there?"); *Id.* at 17 ("MR. BAYS: His right to an education is being jeopardized because of rumors.").

R.M.B. was also given a full and meaningful opportunity to tell his side of the story. R.M.B. claimed at the hearing that another student, identified as J.T., must have put the substance in his cinch pack on the bus when he was not paying attention. Hr'g Tr. 11–13. This story was inconsistent with R.M.B.'s previous statement to Wilson that a student had given him the leaf and lighter to keep. R.M.B. was allowed to explain the inconsistency, stating that he lied to Wilson because he thought Wilson would find his initial story more believable. *Id.* at 12–13.

Finally, Duis made on the record his finding that based on "all things being presented and are here today . . . I think it's clear that [R.M.B.] possessed marijuana or a look alike very close to it at school . . . Based on statements I heard from [R.M.B.] today that the search took place, it seems to me he knew it was there because he told [Wilson] about how he got it." Hr'g Tr. 20.

In short, R.M.B. was provided with notice of the charges and received a robust and full hearing at which he was able to tell his side of the story with the assistance of his parents and his attorney. This satisfied the requirements of due process. Wilson and Duis are accordingly entitled to summary judgment in their favor.

C.  SUBSTANTIVE DUE PROCESS

Plaintiffs claim that R.M.B. has a liberty interest to be free from criminal prosecution except when police and prosecutors have probable cause. Plaintiffs allege that Calohan and Wilson violated that right because they "pursued criminal prosecution of R.M.B. with the full knowledge that R.M.B. did not commit the alleged offense, *i.e.*, possession of marijuana." Pls.' Compl. ¶ 71.

While the Fourteenth Amendment's due process clause does "guarantee[] more than fair process," *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997), neither the Supreme Court nor the Fourth Circuit recognize a liberty interest to be free from criminal prosecution except upon

probable cause. *See Albright v. Oliver*, 510 U.S. 266, 274–75 (1994) (the substantive due process clause does not provide a substantive right "to be free from criminal prosecution except under probable cause."); *Taylor v. Waters*, 81 F.3d 429, 436 (4th Cir. 1996) ("[N]o substantive due process right against prosecution on less than probable cause exists under the Fourteenth Amendment—at least where there is no quantum of harm occurring between the initiation of groundless charges and the seizure."). Indeed, Plaintiffs concede, in their memorandum in opposition, that their substantive due process claim fails. *See* Docket No. 81, at 2 ("[C]onsequently, except as to substantive due process Defendants' Motion for Summary Judgment must be denied.").

Accordingly, I will grant summary judgment in favor of Calohan and Wilson.

### IV. CONCLUSION

For the aforementioned reasons, Defendants' motion for summary judgment will be granted. Plaintiffs' cross-motion for summary judgment will be denied. An appropriate order will accompany this memorandum opinion.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this __11th__ day of March, 2016.

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE